**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARISOL J. ARROYO,

    *Plaintiff*,                 CASE NO. 14-CV-14358

*v.*                          DISTRICT JUDGE LAURIE J. MICHELSON
                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF
SOCIAL SECURITY,

    *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Doc. 2). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 13.)

Plaintiff Marisol J. Arroyo was 36 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 8 at 46.) Plaintiff's work history includes employment as a child care provider for two years, and an unskilled general laborer for seven years. (Tr. at 223.) Plaintiff filed the instant claims on August 8, 2012, alleging that she became unable to work on January 1, 2008. (Tr. at 190, 197.) The claims were denied at the initial administrative stage. (Tr. at 97, 98.) In denying Plaintiff's claims, the Commissioner considered asthma and affective disorders as possible bases for disability. (*Id.*) On June 4, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Gregory Holiday, who considered the application for benefits *de novo*. (Tr. at 70-96.) In a decision dated August 13, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 16-35.) A previous application had been denied on April 20, 2009. (Tr. at 143.) On August 29, 2013, Plaintiff requested a review of the August 13, 2013 decision. (Tr. at 14-15.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 15, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On November 13, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.  Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137,

142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401 *et seq*., and the SSI program of Title XVI, 42 U.S.C. § 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2015, and that Plaintiff had not engaged in substantial gainful activity since January 1, 2008, the alleged

onset date. (Tr. at 21-22.) At step two, the ALJ found that Plaintiff's asthma/chronic obstructive pulmonary disease (COPD), hypertension (HTN), intermittent explosive disorder, obesity, depression, osteoarthritis, alcohol abuse and major depressive disorder (MDD) were "severe" within the meaning of the second sequential step. (Tr. at 22-23.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 23-24.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 30.) The ALJ also found that as of the alleged onset date, Plaintiff was 35 years old, which put her in the younger individual age 18-49 category. *See* 20 C.F.R. §§ 404.1563 and 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 24-30.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 31-32.)

### E.   Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that on April 2, 2011, Plaintiff was discharged from counseling services at Southwest Counseling Services because "Client [was] Non-Compliant." (Tr. at 380.)

On April 26, 2012, Dr. Emilio Berrios-Antuna noted that Plaintiff had "obesity, smoking history, sedentary lifestyle, asthma" and hypertension. (Tr. at 283.) Sonographic images of Plaintiff abdomen taken in January 2012 were unremarkable. (Tr. at 286.)

Plaintiff was also treated at Henry Ford Hospital from September 2011 through June 2012. (Tr. at 311-58.)  In September 2011, Plaintiff was treated in the emergency room for asthma and shortness of breath. (Tr. at 321, 335-40.) Chest x-rays were normal. (Tr. at 375.)

On October 12, 2011, Plaintiff reported "I feel better, but I am not back to my baseline." (Tr. at 346.) Dr. Cynthia Ray, M.D. noted that Plaintiff had stopped drinking alcohol "for the past 2 months because when she drinks, she tends to drink heavily." (Tr. at 346.)

7

In October and November 2011, pulmonary function tests were normal except the FEV1 and FVC (forced expiratory volume and forced vital capacity) were reduced, although airway obstruction was not demonstrated. (Tr. at 368, 372.)

On December 1, 2011, Plaintiff was referred for an evaluation for obstructive sleep apnea, was provided with a CPAP mask, and was counseled on the "importance of weight loss" and "to quit smoking[.]" (Tr. at 332-33, 365-66, 269-70.)

On March 8, 2012, Dr. Ray followed up with Plaintiff regarding her asthma and noted that Plaintiff reported "[m]y breathing is the same as always." (Tr. at 344.) Dr. Ray noted that Plaintiff's asthma was not well controlled and Dr. Ray was "not sure how much of it is medication availability/noncompliance/not understanding the importance of using the medications as prescribed." (Tr. at 344.)

On April 9, 2012, Dr. Barry Lewis, D.O. followed up with Plaintiff regarding hypertension and discussed risk factor modification with Plaintiff, *i.e.*, weight loss, smoking cessation, salt restriction, and medication compliance. (Tr. at 343.)

On April 26, 2012, an echocardiogram was normal. (Tr. at 363.) A CT of Plaintiff's head taken on June 16, 2012 was normal. (Tr. at 373.) Chest x-rays were also normal. (Tr. at 374.)

On June 16, 2012, Plaintiff sought emergency treatment for headaches and hypertension. (Tr. at 316, 402-04.) Her doctor "reiterate[d] need for compliance with meds, diet and fluid restriction" and "need to stop smoking." (Tr. at 330.) Plaintiff was also noted that have a "[h]istory of non-compliance." (Tr. at 331.) Plaintiff was also treated for hypertension, was given lifestyle counseling regarding avoiding salt, walking 20 minutes per day, stopping smoking cigarettes, and weight management. (Tr. at 312, 348.)

On July 16, 2012, Plaintiff was evaluated by Usha Sudindranath, Psychiatrist. (Tr. at 383-86, 407-10.) He noted that the "main reason for her depression is the financial issues she is going through as well as problems with her three children." (Tr. at 383.) Plaintiff reported that she does not sleep well, that "she hears voices occasionally calling her name and she sees shadows at times and she is very anxious and super sensitive." (*Id*.) However, those "psychotic features" were "mild" and were "not pervasive or constant symptoms." (Tr. at 385.) It was also noted that Plaintiff attempted suicide twice in the past but has never been psychiatrically hospitalized. (Tr. at 384.) Plaintiff "admits she did not give [Celexa] a full try" when she was prescribed the medicine in the past. (Tr. at 385.) Plaintiff also "admits to having abused alcohol for the last year." (*Id*.) Plaintiff was diagnosed with depression, her prognosis for employment was "guarded to fair" and she was assessed a GAF score of 45. (*Id*.)

On August 2, 2012, Plaintiff was seen by Dr. Berrios Antuna, M.D., for a cardiac consultation. (Tr. at 325-26.) Dr. Antuna noted that Plaintiff has 'refractory hypertension despite three ongoing blood pressure recommendations" and recommended increasing dosages. (Tr. at 326.)

Plaintiff underwent a consultative examination on September 12, 2012, with Dr. Mises Alviar, M.D. (Tr. at 389-91.) Plaintiff was 4'10" and weighed 200 pounds at the time and her body mass index (BMI) was 42. (Tr. at 390-91.) Plaintiff's grip and dexterity were normal, she had some pedal and tibial edema, she "gets on and off the examination table with no difficulty. Her gait is normal. She can do tandem, tiptoe and heel walking with no problems[,]" she was able to bend, stoop, and squat to 80%, and "[r]ange of motion of all joints [was] within normal limits." (Tr. at 391.)

On September 27, 2012, consultative physician Dr. Claire Issa, M.D. completed a Residual Functional Capacity "(RFC") assessment wherein she opined that Plaintiff could perform sedentary work. (Tr. at 128.)

On October 23, 2012, therapist Diane Carew, LPC, completed a medical source statement, noting that she began counseling Plaintiff on July 2, 2012. (Tr. at 398-401.) On October 23, 2012, Carew completed a medical source statement concerning Plaintiff's mental health. (Tr. 398-401). This statement is composed entirely of checked boxes, without any additional comments or findings. (*Id.*). In that form, Carew found Plaintiff moderately limited in terms her ability to understand and remember very short and simple instructions; ability to perform activities within a schedule; ability to make simple work-related decisions; being aware of hazards and the ability to travel in unfamiliar places; and in some areas of social interaction. (*Id.*). Carew found Plaintiff mildly limited in terms of her ability to carry out short and simple instructions; in all other areas of functioning she found that Plaintiff suffered from marked limitation. (*Id.*).

On January 25, 2013, Plaintiff was discharged from counseling with Ms. Carew because of "No Show/No Contact." (Tr. at 416.)

On March 13, 2013, Plaintiff was seen by Gemma Bransdorfer, LLMSW. Plaintiff reported that she had been sober since January of 2013, that she was not sleeping well, and that she felt "stress over her financial situation because she has to depend so much on other people to help her." (Tr. at 411.) Plaintiff reported enjoying playing bingo, dominoes, and cards. (Tr. at 413.) Plaintiff "states she continues to fight for SSI and recently applied for medicaid." (Tr. at 414.) Plaintiff's diagnosis for depression and GAF score of 45 were unchanged. (*Id.*).

Plaintiff was treated in December 2013 for hypertension and asthma in the emergency room. (Tr. at 442-53.) Plaintiff was noted to be positive for cannabinoids at the time, and although she was warned about the potential risk of heart attack, stroke, or death, she was "seen leaving the floor to smoke [cigarettes] often by the nurses." (Tr. at 443.) Echocardio tests were normal and Plaintiff was discharged in fair condition. (Tr. at 443-48.) Other exams were unchanged or normal. (Tr. at 454-531.)

At the administrative hearing held on February 3, 2009, Plaintiff testified that she has three children, ages 14, 16 and 17 years old, that live with her in her second-floor apartment. (Tr. at 47.) Plaintiff was diagnosed with asthma in 1988. (Tr. at 148.) Plaintiff stated that she can only walk for "15 to 20 minutes" at a time, that she can stand for "maybe two, three hours" and can sit "all day" without interruption. (Tr. at 50-51.) Plaintiff also indicated that she could lift "10 or 20" pounds but could not do it frequently because she would be "doing it with fatigue" and difficulty breathing. (Tr. at 51.) Plaintiff stated that she gets upset and angry with her children and gets stressed out. (Tr. at 53.) Plaintiff has not sought emergency treatment for asthma since 2006, but did go once for hypertension, whereupon she was given medication and sent home. (Tr. at 56.) Plaintiff cooks things like soup for herself but she stated that her children cook for themselves and do the shopping. (Tr. at 57-58.) Plaintiff stated she rarely leaves home; she watches television and especially enjoys soap operas. (Tr. at 58-59.) Plaintiff talks to her sister on the phone twice a day and also speaks with her cousins and gets along with them. (Tr. at 59-60.) Plaintiff initially stated that she goes to her sister's house every day but then said, "I don't really go over there, like that, but I sometimes do, but I really stay home." (Tr. at 60.) Her sisters and cousins visit every day to gossip and talk. (Tr. at 61.) When asked whether she has any other impairments other than asthma and hypertension, Plaintiff responded, "No." (*Id*.)

At the administrative hearing held on February 3, 2009, the ALJ asked the vocational expert ("VE") to consider an individual with Plaintiff's background who

> has a reduction for capacity for light work, for that her ability to do light work is limited or reduced, should I say, by the fact that she can occasionally climb stairs, rope, ladders, scaffold, and unprotected height due to the symptoms that are directly associated with her underlying medical impairment. She has a low operation of dangerous machinery, *i.e.*, driving most vehicles because of - - she has to avoid driving frequently, that is to say because of underlying symptoms associated with her impairment. And she must avoid concentrated exposure to fumes, dust, perfumes, and other odors. And she must avoid more than occasional exposure to extreme heat and temperatures, for example, extreme coldness and hot.

(Tr. at 65 .) The VE responded that such a person could not perform Plaintiff's past relevant work, but could perform 1,000 visual inspector checker jobs, 2,500 small products assembler jobs, and 2,500 hand packager jobs available at the light level in Southeastern Michigan. (Tr. at 65-66.)  The VE affirmed that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 66.) When asked whether a person could still perform such jobs if she had a moderate limitation as to carrying out detailed instructions and maintaining attention or concentration, and in completing a normal workday or workweek without interruptions from psychological issues, the VE responded that "there would be no change in [his] previous answer." (Tr. at 67.)

At the administrative hearing held on June 4, 2013, Plaintiff's counsel amended the alleged onset date to May 1, 2009, based on the prior ALJ decision from April of 2009. (Tr. at 74.) Plaintiff's children were now 18, 21, and 22 years old, and Plaintiff testified that she has no problem taking care of her personal needs, she sometimes cooks but often eats food given to her by neighbors, she does her own laundry "little by little" approximately once a week, and she grocery shops when she receives coupons, approximately once a month. (Tr. at 77-78.) She testified that she does not walk long distances because she gets "agitated" and she "feel[s] like my heart goes very fast." (Tr. at 78.) Plaintiff said that for the last "couple of months" she has only been able

to walk two blocks because she has gained weight and is heavier now. (Tr. at 79.) Plaintiff clarified that she gained 60 pounds in the last two years. (Tr. at 83.) She stated she has no problems using her arms and uses her daughters' cellular telephones. (Tr. at 79-80.). Plaintiff testified that she has been trying to cut back on cigarette smoking such that one pack will now last three days. (Tr. at 80.) Plaintiff quit drinking alcohol four months prior to the hearing. (Tr. at 81.) Plaintiff testified that she gets along well with people and she "would say I've never had any problems." (Tr. at 82.) Plaintiff indicated that she did not have any problems sitting other than the fact that she was "kind of nervous, that's all." (Tr. at 82.)

When asked by her attorney whether her breathing had gotten worse or better since the last hearing in 2009, Plaintiff responded, "Has not improved; it's the same." (Tr. at 83-84.) When asked how long she can perform a given task, she stated "like, half an hour, and I go little by little, and I sit." (Tr. at 85.) Plaintiff enjoys watching television, especially shows like CSI and other shows about police. (Tr. at 86.) Plaintiff indicated that "because of the stress" she sometimes lies in bed for days without the desire to speak to anyone, and that such episodes can last for five days. (Tr. at 87.) Plaintiff also stated that she still gets very angry. (Tr. at 89.)

> The ALJ asked the VE to consider a person with Plaintiff's background who is able to perform at not more than light exertional level with the following limitations: no more than occasional climbing; must avoid even moderate exposure to temperature extremes; must avoid concentrated exposure to environmental irritants, like dust, gases, fumes, odors; must avoid all exposure to unprotected heights; limited to simple, routine tasks; must be employed in a low-stress job - - I would define that as a job calling for no more than occasional decision making, no more than occasional changes in the work setting; must have work that's not at a production rate or production pace, and I recognize that most jobs have some level of pace to them - - this is a restriction on the amount of pace; finally this person needs a job that would allow the person to be off task up to 10 percent during the workday.

(Tr. at 91.) The VE responded that such a person could not perform any of Plaintiff's past work but could perform the 2,500 small products assembler jobs, the 2,500 hand packager jobs, and the 1,000 visual inspector jobs available in Southeastern Michigan. (Tr. at 91-92.) When asked to change the hypothetical to restrict pushing and pulling to no more than frequently bilaterally with upper extremities, no climbing of ropes of scaffolds, and no more than frequent overhead reaching and handling, and a limitation to avoiding even moderate exposure to environmental irritants or poorly ventilated areas, the VE responded that the job numbers would remain the same. (Tr. at 92.) If the hypothetical worker needed a sit/stand option, the numbers would nonetheless remain the same. (Tr. at 93.) When asked, the VE responded that his testimony was consistent with the DOT to the extent the DOT addressed the topics. (Tr. at 93.)

### F.    Analysis and Conclusions

#### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light work. (Tr. at 24-30.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

14

## 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 12.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ committed reversible error in giving little, if any, weight to Plaintiff's treating mental therapist, Diane Carew. (Doc. 12 at 18-22.) In addition, Plaintiff argues that there is no support in the record for the ALJ's RFC assessment as to light work since the only medical source opinions of record, from Dr. Claire Issa and Dr. Mises Alviar, found Plaintiff was only capable of work at the sedentary level and "less than light work" level, respectively. (Doc. 12 at 22-25.) Plaintiff further contends that the ALJ failed to properly address Plaintiff's mental RFC. (Doc. 12 at 25-29.) Finally, Plaintiff posits that the ALJ failed to comply with SSR 96-8p by failing to adequately explain the RFC assessment. (Doc. 12 at 29-32.)

The Court's review of the ALJ's decision in this matter differs from most Social Security benefits cases because there was a prior denial of benefits dated April 20, 2009. Although Plaintiff did not address the concept of *res judicata*, I note that the Commissioner did. In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing request where "res judicata applies in that we have made a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (Posner, J.) (discussing the "collateral estoppel branch of *res judicata*" in Social Security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review.").[1] The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. Soc. Sec. Admin., *Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999) (hereinafter "*Hallex*"). These include the RFC and various other findings

---

[1] The Sixth Circuit has not decided "whether a party asserting collateral estoppel in a Social Security case . . . must establish the traditional elements of collateral estoppel." *Brewster*, 145 F. App'x at 547. *See also Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 514-15 (6th Cir. 2011) (suggesting that the elements do not apply); *id.* at 519-21 (White, J., dissenting in part) (noting that Sixth Circuit unpublished decisions and other authority "strongly suggest that traditional rules of collateral estoppel should apply to the decisions of ALJs in social security disability cases"); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *4 (6th Cir. 2000) (applying one of the elements in a Social Security case).

along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof. Thus, as applied in this Circuit, the AR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 838-39, 843. *See also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison

to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine de novo the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained,"[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993). Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 WL 4502955, at *4 (E.D. Mich. Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first

18

ALJ. *Id.* at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence, but a change in Plaintiff's condition.

I suggest that on this record, there is no new, material evidence showing deterioration since April of 2009. To the contrary, there is evidence showing that Plaintiff's condition was the same as before. Plaintiff reported her asthmatic symptoms were the same in 2012 as always. (Tr. at 344.) Although Plaintiff indicated that she had experienced more depression since 2009, she failed to keep up with her counseling sessions and was twice discharged for non-compliance. (Tr. at 380, 416.) In addition, any increased symptoms were attributed to financial issues and problems with her children, rather than a deterioration in her condition. (Tr. at 383, 411.) Plaintiff was never psychiatrically hospitalized. (Tr. at 384.) Plaintiff may have become more obese after 2009, but there is nothing indicating that the increased weight had a functional effect, other than Plaintiff reporting that she could not walk as far since she gained weight; however, medical evidence revealed no impediment to Plaintiff being able to walk. (Tr. at 390-91.) Certainly there was no change in circumstances with respect to Plaintiff's recommended care: Plaintiff was consistently admonished to change her sedentary lifestyle, stop smoking, stop drinking, and be compliant with medications. (Tr. at 283, 269-70, 312, 330-31, 332-33, 343, 344, 348, 365-66.)

Finally, despite Plaintiff's problems, test results showed normal or unchanged results. Sonographic images of Plaintiff abdomen taken in January 2012 were unremarkable. (Tr. at 286.) In September 2011, chest x-rays were normal. (Tr. at 375.) In October and November 2011, pulmonary function tests were normal except the FEV1 and FVC (forced expiratory volume and forced vital capacity) were reduced, although airway obstruction was not demonstrated. (Tr. at 368, 372.) On April 26, 2012, an echocardiogram was normal. (Tr. at 363.) A CT of Plaintiff's head taken on June 16, 2012, was normal. (Tr. at 373.) Chest x-rays were also normal. (Tr. at 374.)

I therefore suggest that Plaintiff has not demonstrated that her condition worsened since the previous denial in 2009 because she has not shown new and material evidence of deterioration. *Drogowski, supra.*

I further suggest that the checked-box form provided by Diane Carew, LPC, therapist is inadequate to show deterioration in Plaintiff's mental abilities. First, as noted by the ALJ, a therapist's opinion is not entitled to controlling weight because it is not an opinion of a treating source as defined in the regulations. *See* 20 C.F.R. § 404.1513(a); *Miller v. Comm'r of Soc. Sec.*, No. 1:08-CV-1022, 2010 WL 502761, at *5 (W.D. Mich. Feb. 5, 2010) (citing *Doolin v. Astrue*, No. 3:08-cv-243, 2009 WL 1212232, at *8 (S.D. Ohio May 1, 2009) ("a counselor's opinion is not entitled to controlling weight")). Furthermore, there is no evidence of testings or findings that support the conclusions stated in the boxes checked. If the conclusions are based solely on Plaintiff's reported symptoms, such conclusions are not evidence, they are the "'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)); *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (Noting that a doctor's findings which "merely regurgitate[] . . . self-described symptoms" do not constitute a medical opinion.); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data."). Finally, the checked-box form, without tests, observations or other medical data, is insufficient; thus, the ALJ was free to discount the conclusions and committed no error in doing so. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) (holding that ALJ properly discounted

20

doctor's opinions on a check-off form which "did not cite clinical test results, observations, or other objective findings as a basis for determining [the plaintiff's] capabilities"); *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (holding that the ALJ properly discounted the treating physician's opinion that consisted of checklist forms which cited no medical evidence and provided little or no elaboration).

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 30, 2015                    S/PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 30, 2015                     By s/Durene Worth
                                           Acting in the absence of Kristen Krawczyk
                                           Case Manager to Magistrate Judge Morris